UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

DOROTHY PEELE,                  :     Hon. Joseph H. Rodriguez

      Plaintiff,              :     Civil Action No. 09-2267

v.                              :

TOWNSHIP OF WEST DEPTFORD       :     MEMORANDUM OPINION
POLICE DEPARTMENT, et al.,
                                :
      Defendants.

      This matter is before the Court on a motion for summary judgment pursuant to Fed. R. Civ. P. 56 filed by Defendants the Township of West Deptford Police Department, Chief of Police Craig Mangano, Michael J. Cramer ("Cramer"), and Craig Burman ("Burman"). The civil rights claim alleging excessive force and failure to train and supervise was originally filed by Plaintiff Dorothy Peele in the Superior Court of New Jersey, Law Division, Gloucester County, but was timely removed to this Court. Plaintiff claims that she was subjected to excessive force in her home, on or about October 11, 2007, in the course of the arrest of her grandson, Gregory Tucker.

      Oral argument on the motion was heard on the record on December 2, 2010 and that record is incorporated here. In opposition to the motion, and on the record during oral argument, Plaintiff agreed to dismiss her claims against West Deptford Township, Police Chief Craig Mangano, and Officer Craig Burman. In addition, Plaintiff consented to the dismissal of the Equal Protection claim and the harassment claim. The parties filed a consent order stipulating to the termination of these claims on December 27, 2010. See Dkt. Entry No. 16. The only count that remains is a claim against Officer

Michael Cramer for the use of excessive and unnecessary force during the events on October 11, 2007.

Defendant Cramer moves for summary judgment on the theory that he is entitled to qualified immunity. For the reasons discussed on the record during oral argument, and those below, the motion for summary judgment will be denied.

## I. Facts

The following facts are not in dispute. Plaintiff Dorothy Peele is a sixty year old woman, who has no criminal record. She claims that, at 11:00 o'clock in the evening on October 11, 2007, while she was at home with her daughter, Angela Tucker, and her 17 year old grandson, Gregory Tucker, two West Deptford Police Officers knocked at her door. The Officers, Cramer and Burman, were permitted to come inside. They informed Peele that they were looking for Justin Peele and Gregory Tucker; both were believed to have been involved in an earlier incident that sent a man to the hospital. Dorothy Peele is the grandmother of both boys, and she has legal guardianship over Tucker.

After Peele let the Officers in and informed them that only Gregory Tucker was at the home, Cramer asked to speak with him. Tucker was asleep in an upstairs bedroom and Peele was permitted to ascended the stairs to fetch him. From this point on, the parties offer different versions of the series of events that took place after Peele and Tucker came down the stairs. In order to put the events into context, it is necessary to discuss the setting of the incident.

Plaintiff's stairs to the second floor are located in her living room. The parties submitted photographs of the stairs and the adjacent rooms. Plaintiff's Ex. P., 1-3. Where the stairs meet the living room, a large television is against one wall, with a large

couch and coffee table against the other wall. The configuration of the room results in a small pathway to the stairs. By any measure, this is not a large space.

On a summary judgment motion, the facts are viewed in a light most favorable to the non-moving party. Pearson v. Component Tech. Corp., 247 F.3d 471, 482 n.1 (3d Cir. 2001). According to Peele, the following took place. After she came down the stairs, with her grandson behind her, Peele states that she stepped off of the landing and into the living room. Ex. C-1., Peele Dep., 29;15-24. She claims that she was not blocking the stairs. Id. at 29;23-25. Once Peele was in the living room, Cramer told Tucker he was under arrest. Id. at 33;1-3. Peele replied "No, he's not," or something to that effect. Id. at 33;6. She asked for a reason for the arrest and Cramer provided no explanation. Id. at 33;10-24. Burman corroborates that no reason was provided to Peele. Ex. A., Burman Dep., 26-31.

Peele denies ever raising her voice and states that she was now standing near the door. Ex. C-1., Peele Dep., 34;10-25. She acknowledges that no one could go through the door unless she moved. Id. at 34;25 to 35;1. Peele describes the following events:

> Yes. After they started taking him out, and I was standing in front of the door. And so I told him that he wasn't taking him out until he told me why he was taking him, because he was a minor. And he told me that he didn't have to tell me anything. And he told me to get out of his way. Well, he shoved me.
> And then he also, at one point, he grabbed me by my arm. When he shoved me, he grabbed me by my arm first and he shoved me. And I fell over the chair. My chair was one of those metal - - the metal chairs. When I fell on the chair, the metal part of the chair bruised my side. I also knocked over the fan that was in the living room.

Id. at 35;4-25.

Peele denies putting her hands on any of the police officers. Id. at 35;20 to 36;14.

She claims that she was standing in front of the door as the officers were taking Tucker out and asking them why he was under arrest. Id. at 39;1-25. She agrees that she was blocking the door, but denies that it was in attempt to impede the arrest; it was just her position in the house. Id. at 39;1-3. She claims that Cramer grabbed her arm and shoved her because she in the way of the officers trying to take Tucker out of the house. Burman took control of Tucker, who was in handcuffs and compliant, and Peele claims Cramer shoved her again causing her to land in the kitchen. Id. at 41;17-22. Then she tried to call 911:

> Q. From the point that you described for me, which was you've testified about being shoved two separate times by Detective Cramer, up to this point - - correct?
>
> A. Yes.
>
> Q. From the point that you were shoved the first time, which was your testimony, to the point you were shoved the second time, what were you saying at that point? Were you yelling?
>
> A. I was asking him why was he doing that, because I was fearful with the rage and the anger he had. I said, why are you doing this? I'm cooperating with you. He was just out of control. He was just in a rage. And he just continually pushed me. I told you, put your hands behind your back. You're under arrest. You're under arrest.
>
> Q. Up until the time that you testified that you fell a second time face-down, do you remember Detective Cramer saying stop resisting?
>
> A. No, because I wasn't resisting him.
>
> Q. What happened after you fell in the second time into the kitchen?
>
> A. After I fell the second time in the kitchen, then I got up. But at one point, he told me to stay down, not to get up.
>
> Q. What happened after that?
>
> A. Then when he moved away, I got up. And the third time - - he

> pushed me the third time and I fell in the kitchen again when he came back. And that's when I called 911.

Id. at 48 to 49;20.

While she was on the phone with the dispatcher, Cramer grabbed the phone from her and "shoved" her again. Id. at p. 54;13-23.

Cramer denies using excessive force and describes a series of event that includes Peele repeatedly resisting arrest and disobeying orders. See Ex. B., Cramer Arrest Report. In addition, he states that he never pushed her; instead his report details several somewhat-successful attempts to subdue and "place" or restrain Peele on the floor. Both Cramer and Burman state that Peele and her daughter attempted to block the arrest of Tucker by placing themselves in front of Tucker. Then, the women converged on Cramer as he began the arrest, with Peele "punching" Cramer's right arm. Cramer Report, Ex. B.; Burman Arrest Report, Ex. C. Both Police Officer depositions are consistent on this point.

In addition, Cramer states that Peele ran away when he attempted to arrest her and then called 911. Cramer Arrest Report, Ex. B. At this point he had informed her that she was under arrest, but she refused to submit to arrest. Id. He, therefore, had to place her under arrest while she was on the phone with a dispatcher. Id.

## II. Summary Judgment Standard

"Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law." Pearson, 247 F.3d at 482 n.1 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)); accord Fed. R. Civ. P. 56 (c). Thus, this Court

will enter summary judgment only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (c).

An issue is "genuine" if supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit. Id. In determining whether a genuine issue of material fact exists, the court must view the facts and all reasonable inferences drawn from those facts in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. Id.; Maidenbaum v. Bally's Park Place, Inc., 870 F. Supp. 1254, 1258 (D.N.J. 1994). Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. Andersen, 477 U.S. at 256-57. "A nonmoving party may not 'rest upon mere allegations, general denials or . . . vague statements . . . .'" Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs, 982 F.2d 884, 890 (3d Cir. 1992) (quoting Quiroga v. Hasbro, Inc., 934 F.2d 497, 500 (3d Cir. 1991)). Indeed,

> the plain language of Rule 56(c) mandates the entry of summary

> judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

Celotex, 477 U.S. at 322.

In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). Credibility determinations are the province of the factfinder. Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

### III. Analysis

Plaintiff's Constitutional claim of excessive force is governed by Title 42 U.S.C. § 1983, which provides a civil remedy against any person who, under color of state law, deprives another of rights protected by the United States Constitution. See Collins v. City of Harker Heights, 503 U.S. 115, 120 (1992). A Plaintiff must demonstrate two essential elements to maintain a claim under § 1983: (1) that the Plaintiff was deprived of a "right or privileges secured by the Constitution or the laws of the United States" and (2) that Plaintiff was deprived of her rights by a person acting under the color of state law. Williams v. Borough of West Chester, Pa, 891 F.2d 458, 464 (3d Cir. 1989).

The parties agree that Cramer was acting under the color of law. While only the first element of Plaintiff's § 1983 claim is at issue, Cramer asserts that his actions dictate that he is immune from suit. Thus, the Court will address whether the doctrine of qualified immunity applies.

## A. Qualified Immunity

The doctrine of qualified immunity provides that "government officials performing discretionary functions . . . are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Thus, government officials are immune from suit in their individual capacities unless, "taken in the light most favorable to the party asserting the injury, . . . the facts alleged show the officer's conduct violated a constitutional right" and "the right was clearly established" at the time of the objectionable conduct. Saucier v. Katz, 533 U.S. 194, 201 (2001). Courts may exercise discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand. Pearson v. Callahan, 129 S. Ct. 808, 818 (2009).

Defendant Cramer seeks summary judgment on the claim of excessive force. The proper analysis of an allegation of excessive force considers the particular force used in the light of the surrounding circumstances of the incident. Graham v. Connor, 490 U.S. 386, 396 (1989). In Graham, the Supreme Court held that all claims of police use of excessive force are properly analyzed under the Fourth Amendment's "objective reasonableness" standard. Id. "Because police officers are often forced to make split second judgments . . . about the amount of force that is necessary in a particular situation, the reasonableness of the officers' belief as to the appropriate level of force should be judged from that on-scene perspective." Saucier, 533 U.S. at 205. Thus, Courts are to carefully scrutinize allegations of excessive force with respect to the

circumstances surrounding each incident. Graham, 490 at 397.

It is well settled that "[p]olice officers are privileged to commit a battery pursuant to a lawful arrest." Groman v. Twp. of Manalapan, 47 F.3d 628, 634 (3d Cir. 1995). However, the use of force must be "objectively reasonable" and "evaluated under the totality of the circumstances." Sharrar v. Felsing, 128 F.3d 810, 822 (3d Cir. 1997). "Factors to consider in making a determination of reasonableness include the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he actively is resisting arrest or attempting to evade arrest by flight." Kopec v. Tate, 361 F.3d 772, 776-77 (3d Cir. 2004) (citing Graham, 490 U.S. at 396).

### 1. Whether The Officer's Conduct Violated A Constitutional Right

Here, given the factual dispute, it is difficult to ascertain "the circumstances . . . at hand." Pearson, 129 S. Ct. at 818; see also Graham, 490 U.S. at 396. However, viewing the facts in a light most favorable to Plaintiff, the force used by Cramer was not objectively reasonable under the circumstances. As a result, "the facts alleged show the officer's conduct violated a constitutional right" and Cramer is not entitled to qualified immunity under this prong of the doctrine. Saucier, 533 U.S. at 201.

Cramer, therefore, is only entitled to qualified immunity if Plaintiff's right was not clearly established.

### 2. Whether the Right was Clearly Established

For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Saucier, 533 U.S. at 202 (quoting Anderson v. Creighton, 483 U.S.

9

635, 640 (1987)). That is, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Couden v. Duffy, 446 F.3d 483, 492 (2006). "If the officer's mistake as to what the law requires is reasonable," the officer is entitled to qualified immunity. Couden, 446 F.3d at 492 (internal citations omitted). Further, "[i]f officers of reasonable competence could disagree on th[e] issue, immunity should be recognized." Malley v. Briggs, 475 U.S. 335, 341 (1986). See also Brosseau v. Haugen, 543 U.S. 194, 198 (2004) (The general touchstone is whether the conduct of the official was reasonable at the time it occurred.). Finally, because qualified immunity is an affirmative defense, the burden of proving its applicability rests with the defendant. See Beers-Capital v. Whetzel, 256 F.3d 120, 142, n.15 (3d Cir. 2001).

Cramer relies on two unpublished decisions in support of his immunity argument. Although the cases bear some factual similarity, neither case is controlling. In Blacknall v. Citarella, the Court found that an officer's use of "minimal force" did not violate the Fourth Amendment. 168 Fed. Appx. 489 (3d Cir. 2006). There, police officers were responding to sounds of gunfire coming from a community hall. Id. at 492. After initiating contact with the plaintiff in an attempt to locate the weapon, the plaintiff acted belligerently, cursed at the officer, and eventually hit him. Id. The officer took plaintiff down with a "leg sweep" and plaintiff sustained a scratch to his face. Id.

In Person v. Willingboro Twp., Civ. No. 02-3808, 2005 WL 2077285 (D.N.J. Aug 25, 2005), defendant police officer went to the plaintiff's home to arrest the plaintiff's son, who was observed running into the back of the plaintiff's house. The plaintiff, who was described as being in poor health because he required the use of a cane, was dressed

only in undergarments. The plaintiff let the defendant in the home to look for the son. During the course of the search of the home, plaintiff positioned himself in front of a door, admittedly blocking or standing in front of the door, but claimed it was not because he was trying to prevent the police officer from entering the bedroom. The police officer told plaintiff he was under arrest for obstruction and then took him down to the floor to restrain him.

As to whether summary judgment could be entered in favor of the defendant police officer under a qualified immunity theory, the district court found that the force used was not objectively reasonable. However, the court went on to find that "a reasonable officer could have believed that Person was committing obstruction, and thus could have believed that Person would not comply if told to turn around and place his hands behind his back. Therefore, it would not have been clear to a reasonable officer that pulling Person to the floor and placing a knee on Person's back in order to handcuff him would be an unreasonable use of force." 2005 WL 2077285, at *5.

Although the facts of this case resemble those present in Blacknall and Person, there are significant differences. Unlike Blacknall, Cramer was not investigating a crime involving the use of a weapon, and there is a question as to whether the officers reasonably believed that a weapon was present in the home. There is no indication that Cramer believed Peele to be armed at any time.[1] And there is a factual question as to

---

[1] There is testimony in the record that suggests that the Officers were concerned that Tucker may be armed because he had a previous arrest for armed robbery. Cramer's Narrative, Exs. B. and C. However, other facts in the record challenge this concern. Specifically, when they went to the home to arrest Tucker, the Officers were invited in by Peele. Then, they permitted Peele to go up stairs, unaccompanied, to inform Tucker that the police were there to talk to him. Cramer asserts that he wanted

whether Peele posed an immediate threat to the safety of the officers, given the conflicting accounts of the events that evening. Peele denies ever striking Cramer and Tucker never saw his grandmother hit the officers. Tucker Dep., 45; 12. Also, unlike Blacknall, the nature of the crime is not severe. Plaintiff was in her own home, in her nightclothes, and claims that she never raised her voice when she was asking for an explanation for Tucker's arrest. She claims that she only became hysterical when she was on the phone with the 911 dispatcher. Peele Dep., 54.

Although the present case is factually similar to Person, there were exigent circumstances present in Person that do not appear to be present here. The police in Person had a warrant for plaintiff's son and saw him enter plaintiff's house. 2005 WL 2077285, at *1. Plaintiff denied that the son was in the home and admitted to using foul and abusive language toward the officers. Id. Person was alleged to have slammed the door on the officers as they attempted to enter the home to look for plaintiff's son. Id. at *2. In Person, the plaintiff was taken down to the floor and the officer placed a knee on

---

to "take him into custody as quickly as possible without giving him [Tucker] the opportunity to run back upstairs" because he had a previous arrest involving a gun. Id., Ex. B.
 By permitting Peele to tell Tucker that the police were in the home, Tucker was afforded an opportunity to run or arm himself before coming down stairs, where he knew the police were waiting for him. Cramer's contention that he had a concern about Tucker being armed is therefore incompatible with his actions that night. Why would Cramer let Peele alert Tucker to police presence, out of the officers' view, if he was truly fearful that Tucker was armed or had access to a gun? Moreover, Cramer never informed Burman that there was a potential that someone in the house was armed. Burman Dep., 34; 14-25. Thus, there is a question of fact as to whether there was any "immediate threat to the officers or others" and concern regarding "the possibility that the subject may be armed." Couden v. Duffy, 446 F.3d 483, 496-97 (3d Cir. 2006)(internal quotations omitted). A jury should determine the credibility of Cramer's concern and its motivation behind his actions on October 11, 2007.

his back.

Here, Peele permitted the police to enter her home and she presented them with her grandson. Unlike the force used in Person, Peele maintains that she was repeatedly shoved by Cramer, who she describes as being in a rage. Peele Dep., 54. At one point, she contends that she was pushed so hard that she landed in a different room. She was also shoved from behind. Id. at 47. Her daughter describes Cramer's actions as "basically slinging my mom around." Angela Tucker Dep., 47; 9-13. And her grandson testified that Peele was "violently swung to the ground and knocked over a chair." Tucker Dep., 48.

There is a question as to whether the nature of the force alleged to have been used by Cramer was reasonable under the circumstances. Peele admits that she did not listen to some of Cramer's instructions. Ex. C-1., Peele Dep., 48 thru 49. After she was instructed to remain in the ground, Peele got up and called 911. Id. At this point, the parties agree that Tucker was restrained and compliant. Peele then avails herself to the police by calling 911 for help. Even if a reasonable officer believed that Peele was obstructing or resisting arrest, the nature of the force alleged to have been employed by Cramer could be considered excessive, under these circumstances.

While Peele was on the phone with the 911 dispatcher, she was taken down. Tucker Dep., at 49. There is a factual question as to whether Peele posed a threat to Cramer, was attempting to evade arrest, or was uncooperative. Cramer admits that he never confronted a situation where he arrested someone who was on the phone with 911 during the course of the arrest. Cramer Dep., 141. In fact, the situation was so unique that Cramer, for the first time ever, alerted his superiors that they may hear about the

incident later on. Id. at 85-86; Mangano Dep,. 12-13.

There is a factual question as to what occurred on October 11, 2007 that prevents consideration of whether the force used by Cramer was reasonable. Even if Cramer believed that Peele was obstructing or resisting, viewing the facts in a light most favorable to Plaintiff, the type and amount of force alleged to have been used against Peele in this case may have been excessive. See Groman v. Twp. of Manalapan, 47 F.3d 628, 634 (2d Cir. 1995) ("Without commenting on the weight of the evidence, we believe it could support a finding . . . Groman's obstreperous behavior did not warrant Kirkland's reaction. We conclude there are material issues of disputed fact, and that a jury could decide that Kirkland and the other officers acted unreasonably and used excessive force.") These facts distinguish this case from Person and Blacknall.

### B. Plaintiff's § 1983 Claim

There are credibility questions related to whether Plaintiff was deprived of a "right or privileges secured by the Constitution or the laws of the United States." Williams, 891 F.2d at 464. As a result, for the same reasons that Cramer is not entitled to qualified immunity at this juncture, summary judgment on Plaintiff's § 1983 claim is denied.

### IV. CONCLUSION

Cramer's motion for summary judgment is denied. Viewing the facts in a light most favorable to Plaintiff, there are credibility determinations appropriate for consideration by a jury that are germane to whether Officer Cramer is entitled to qualified immunity. Certainly, Cramer is not "precluded from arguing that he reasonably perceived the facts to be different from those alleged by the plaintiff,"

14

however, that " contention ... must be considered at trial." <u>Bennett v. Murphy</u>, 274 F.3d 133, 137 (3d Cir. 2002). Thus, Defendant's motion for summary judgment is denied. An appropriate Order shall follow.

Dated: February 9th, 2011

_____
Hon. Joseph H. Rodriguez,
United States District Judge